UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

FELICIA WOODARD,

                    Plaintiff,

     vs.

VINNY'S BUS SERVICE, INC. AND
ROBERT DIMINO,

                  Defendants.

Civil Docket No.: 1:18-CV-01222

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff, by and through her attorneys, The Legal Aid Society, alleges and states as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff Felicia Woodard brings this action against Vinny's Bus Service, Inc. ("Vinny's") and Vinny's owner Robert Dimino ("Mr. Dimino") (collectively, "Defendants") for discriminating against her based on her actual or perceived disability in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; the New York State Human Rights Law, New York Executive Law ("NYSHRL"), §§ 290 *et seq.*; and the New York City Human Rights Law, New York City Administrative Code ("NYCHRL"), §§ 8-101 *et seq.*, for denying her wages due in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206(a); and New York Labor Law ("NYLL") § 652, and for failing to provide her a hiring notice and legally-compliant pay stubs in violation of NYLL §§ 195(1)(a), (3).

2.    Defendants hired Ms. Woodard on or around October 14, 2016, as a school bus driver for special needs students in Staten Island.  Ms. Woodard suffers from mental health

conditions that limit her ability to drive in highly congested traffic areas.  Due to the scarcity of

such areas in Staten Island, however, Ms. Woodard was able to drive and perform the duties of a

school bus driver in that borough without limitation.

3.      On or around April 19, 2017, at the behest of Defendants, Ms. Woodard

completed a job-related medical examination.  In the medical examination paperwork, the

treating physician accurately indicated that Ms. Woodard suffered from anxiety and depression.

After reviewing her medical paperwork, Mr. Dimino publicly and maliciously disclosed Ms.

Woodard's mental health conditions, shouting in an open office area with several employees

present, "What the hell, you got mental disorders?  What the hell is this?"  When Ms. Woodard

confronted Mr. Dimino about his conduct and violation of her privacy, Mr. Dimino falsely

accused her of attempting to conceal her disability in order to get hired and complained that,

because of her "mental problems," her continued employment was problematic.

4.      From the moment Mr. Dimino became aware of Ms. Woodard's disability he

subjected her to a hostile work environment, including by constantly criticizing Ms. Woodard's

performance, repeatedly threatening to fire her for illegitimate reasons, and disparaging her to

coworkers.

5.      Mr. Dimino also denied Ms. Woodard's reasonable accommodation request.  At

the end of the regular school year, Mr. Dimino assigned Ms. Woodard a summer bus route in

Brooklyn.  Ms. Woodard submitted an accommodation request in which she informed Mr.

Dimino that her disability prevented her from driving in highly congested traffic areas, including

Brooklyn, and requested a summer route in Staten Island.  Mr. Dimino denied Ms. Woodard's

request, despite that Staten Island routes were made available to other employees, and effectively

terminated her employment.

6.      In addition, for nearly the entire period of her employment, Defendants required Ms. Woodard to drive students on field trips approximately two times per week.  These field trip shifts occurred outside Ms. Woodard's normally scheduled hours, and typically lasted three to three and one-half hours per shift.  Defendants did not compensate Ms. Woodard for working these field trip shifts.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over Ms. Woodard's ADA and FLSA claims pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

8.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) as this action arose, in substantial part, within the Eastern District of New York, where the unlawful employment practices alleged herein occurred and many of the records pertinent thereto are maintained.

## CONDITIONS PRECEDENT

9.      Contemporaneously with the filing of the Complaint, Ms. Woodard served a copy on the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of Section 8-502 of the New York City Administrative Code.

10.     Plaintiff has also complied with all administrative prerequisites to the filing of her ADA claims.  She filed a timely charge with the United States Equal Employment Opportunity Commission ("EEOC") on June 9, 2017.  The EEOC issued a Notice of Right to Sue on November 27, 2017.  Plaintiff received the Notice of Right to Sue on November 29, 2017.  This Complaint has been filed within 90 days of receipt of that Notice.

## PARTIES

11.    Plaintiff Felicia Woodard is a woman who resides in Staten Island in the State of New York.  She is an individual with a "disability" within the meaning of the ADA, NYSHRL, and NYCHRL, and was an "employee" of Defendants within the meaning of the ADA, FLSA, NYSHRL, NYCHRL, and NYLL.

12.    Defendant Vinny's Bus Service Inc. is a domestic corporation registered in New York State.  Vinny's principal executive office is located at 1040 Rockaway Avenue, Brooklyn, New York, 11236.  Vinny's also operates an office located at 155 Van Pelt Avenue, Staten Island, New York, 10303.  Upon information and belief, Vinny's is owned by Mr. Dimino.

13.    Upon information and belief, at all relevant times, Vinny's employed over 15 full-time employees and was an enterprise engaged in commerce within the meaning of the FLSA in that it (a) had employees engaged in commerce or in the production of goods for commerce, or who handled, sold, or otherwise worked on goods or materials that were moved in or produced for commerce and (b) had an annual gross volume of sales of not less than $500,000.  Vinny's is an "employer" as defined by the ADA, FLSA, NYSHRL, NYCHRL, and NYLL.

14.    Upon information and belief, Defendant Robert Dimino is the owner of Vinny's and sole manager of Vinny's Staten Island office.  Mr. Dimino interviewed, hired, and supervised Ms. Woodard.

## FACTUAL ALLEGATIONS

**Ms. Woodard's Disability and Employment by Defendants**

15.    Ms. Woodard was first diagnosed with anxiety, depression, and panic disorder in or around 1993.  She was additionally diagnosed with mood disorder and PTSD in or around 2005. Ms. Woodard's mental health conditions have impacted her life most significantly by

substantially limiting her ability to sleep, and to regulate her thoughts and emotions.  Since

receiving her initial diagnoses, Ms. Woodard has treated her mental health conditions with

medication and therapy.

16.     Her treatment efforts notwithstanding, Ms. Woodard is unable to perform stress-

inducing activities that trigger or exacerbate her conditions: one such activity is driving in highly

congested traffic areas.

17.     Prior to her employment by Defendants, Ms. Woodard worked for one of Vinny's

competitors as a school bus driver in Staten Island.  Due to the general absence of highly

congested traffic areas in the borough, Ms. Woodard found that she was able to drive

professionally in Staten Island without limitation.

18.     In or around September 2016, Ms. Woodard applied and was hired for a position

with Defendants as a school bus driver for special needs students in Staten Island.  As Ms.

Woodard had interviewed and was hired for a position she could perform without

accommodation, she did not disclose her mental health conditions to Defendants.

19.     Ms. Woodard began working for Defendants on or around October 14, 2016.  She

earned a regular rate of $26.00 per hour and was paid on a weekly basis.

20.     Ms. Woodard worked split shifts Monday through Friday.  Her morning shift

generally began at 6:00 a.m. and ended at 8:30 a.m., and her afternoon shift generally began at

1:30 p.m. and ended at 4:00 p.m.  A bus matron accompanied Ms. Woodard on her bus whenever

students were present.

21.      For her morning shift, Ms. Woodard arrived at base around 6:00 a.m. to perform

a pre-trip vehicle safety inspection before beginning her route around 6:20 a.m.  She generally

picked up the first student on her route at 6:30 a.m., continued to pick up students until around

7:30 a.m., and dropped the students off at school around 8:00 a.m.  Ms. Woodard then drove

back to base, usually finishing her morning shift around 8:30 a.m.

22.     For her afternoon shift, Ms. Woodard conducted another brief vehicle safety

inspection before leaving the base around 1:30 p.m. to pick up the students at school at 2:00 p.m.

Ms. Woodard then dropped the students off at their homes before returning to base, usually

finishing her afternoon shift around 4:00 p.m.

23.     Upon information and belief, if an incident occurred on the bus, Ms. Woodard

was required to complete an incident report per New York City Office of Pupil Transportation

("OPT") policy.  OPT incident reports were required, for example, if students: got into a fight;

assaulted the bus driver or matron; opened the emergency door; damaged or vandalized the bus,

or; required an adult to be present when they were dropped off and no adult was present.  If an

incident occurred on her morning route, Ms. Woodard was required to complete the report

immediately upon her arrival at the school, provide a copy to the school principal, and give the

original to Mr. Dimino for submission to OPT.  If an incident occurred on her afternoon route,

Ms. Woodard completed the report back at base and provided it to Mr. Dimino, who would give

her a copy to provide to the school the following school day.

24.     Prior to disclosing her disability to Defendants, Ms. Woodard did not receive any

negative performance reviews.

**Disability Discrimination: Disparate Treatment and Hostile Work Environment**

25.     On or around April 19, 2017, Defendants required Ms. Woodard to complete a

medical examination.  Upon information and belief, this was an annual medical examination

required of all Vinny's employees.  The physician, who was selected by Defendants, asked Ms.

Woodard what medications she was taking: she disclosed that she was taking Trazadone and

Desvenlafaxine.  The physician noted this information on the medical examination paperwork, and also indicated that Ms. Woodard suffered from anxiety and depression.  Ms. Woodard submitted the completed medical examination paperwork to Jackie,[1] Mr. Dimino's office assistant.

26.     On or around April 21, 2017, after Ms. Woodard completed her morning shift and returned to base, she asked Jackie whether everything was "ok" with her medical examination paperwork.  Jackie handed Ms. Woodard's paperwork to Mr. Dimino, who began to look it over while he stood in the office common area.  A few moments later, Mr. Dimino exclaimed, in front of at least four other employees, "What the hell, you got mental disorders?  What the hell is this?" or words to that effect.  Ms. Woodard was shocked, embarrassed, and humiliated by Mr. Dimino's outburst, and she immediately left the office distraught and in tears.

27.     Shortly thereafter, Ms. Woodard called Jackie on the telephone to express her outrage at Mr. Dimino's behavior and violation of her privacy.

28.     Later that day, when Ms. Woodard returned to base for her afternoon shift, Mr. Dimino asked everyone except her and Jackie to leave the office.  When only the three of them remained, Mr. Dimino pointed his finger at Ms. Woodard and accused her of failing to disclose her disability on her job application.  When Ms. Woodard protested that Mr. Dimino had violated her privacy by disclosing her personal and confidential health information to staff, Mr. Dimino dismissed her complaint and expressed concern that her mental health conditions posed a problem for her continued employment, particularly if discovered by OPT.  When Ms. Woodard insisted her disability did not affect her work, Mr. Dimino directed her to leave the office.

---

[1] Jackie's last name is unknown to Plaintiff.

29.     From this day forward, Mr. Dimino forced Ms. Woodard to work in an environment pervaded by his constant denigration of her performance—nagging, complaining, or bullying her about inconsequential or altogether fictitious matters on an almost daily basis—punctuated by episodes of extreme hostility and abuse.  Some examples include:

a.  In one incident, a student bus passenger with bipolar disorder attempted to stab a school staff member in the neck with a pencil, then repeatedly kicked the glass window in the front door of the bus, all while Ms. Woodard was driving.  Ms. Woodard immediately called the base for instructions; she was told by Peter,[2] a Vinny's office employee, to park the bus and call the police.  Police and emergency medical personnel arrived at the scene and transported the bipolar student and school staff member to the hospital.  After subsequently relating several additional instructions to Ms. Woodard, none of which directed her to obtain the responding police officers' badge numbers, Peter explained that Mr. Dimino was now threatening to fire her for failing to do so and insisting that if she did not go to the precinct and get the badge numbers he would make good on that threat.

b.  The following day, when Ms. Woodard provided the badge numbers to Mr. Dimino, he again threatened to fire Ms. Woodard and accused her of incompetence.  When Ms. Woodard tried to explain how the student endangered everyone on the bus, Mr. Dimino insisted the student did nothing wrong and she should have kept driving.  Mr. Dimino then informed Ms. Woodard she was going to be investigated by OPT for her mishandling of the incident and the agency would soon contact her for questioning.

---

[2] Peter's last name is unknown to Plaintiff.

Ms. Woodard was deeply shaken by Mr. Dimino's threats and feared she might lose her job or OPT certification.  Ms. Woodard was never contacted by OPT, however.

c.  On another occasion, Mr. Dimino complained to Ms. Woodard that OPT was tired of receiving incident reports from him and directed her to limit her future reports to incidents involving a physical altercation only.  Upon information and belief, Mr. Dimino's direction was contrary to OPT policy; by so ordering Ms. Woodard, Mr. Dimino was putting her certification at risk.  From this point forward, whenever Ms. Woodard submitted an OPT incident report, Mr. Dimino expressed disapproval.

d.  In another incident, several students on Ms. Woodard's bus got into a fight.  The bus matron on board, Jennifer,[3] was unable to break up the fight alone, so Ms. Woodard had to pull the bus over and break up the fight herself.  When Ms. Woodard turned in her OPT incident report to Mr. Dimino, he threatened to fire her even though she handled the incident appropriately.  Ms. Woodard was again left extremely shaken by Mr. Dimino's latest threat to her livelihood.

e.  Another harassing incident occurred when Mr. Dimino falsely accused Ms. Woodard of parking her bus on the street incorrectly and leaving her keys in the bus the previous day.  Later that day, Ms. Woodard spoke with Jermaine,[4] a Vinny's bus mechanic, who confirmed she had correctly parked and taken her keys.  When Ms. Woodard attempted to relate this information to Mr. Dimino, he admitted the surveillance video revealed he had improperly accused her.  Nevertheless, apparently upset that Ms. Woodard had publicly discredited him, Mr. Dimino yelled at Ms. Woodard in front of several employees, "But if it's a fight you want, it's a fight you'll

---

[3] Jennifer's last name is unknown to Plaintiff.

[4] Jermaine's last name is unknown to Plaintiff.

get!  And I guarantee you won't win this fight!  Now get out!" or words to that effect.

Ms. Woodard again left the office in tears.

    f.    In another example, one day after work Ms. Woodard noticed Claudia,[5] a bus matron

with whom she was acquainted, sitting in her car outside the office.  Claudia had

applied for a job with Vinny's and just completed her job interview with Mr. Dimino.

Claudia said that when she mentioned her friendship with Ms. Woodard to Mr.

Dimino, he claimed Ms. Woodard was a difficult employee whom no one liked and

was hard to get along with.  Ms. Woodard was extremely disheartened to learn Mr.

Dimino was now denigrating her to colleagues outside the company.

30.    After almost two months of continual harassment, Ms. Woodard filed a charge of disability discrimination with the EEOC against Vinny's.

31.    As her work atmosphere deteriorated, Ms. Woodard increasingly experienced feelings of extreme anxiety, nervousness, and nausea, often beginning with her arrival at the office in the morning.

**Disability Discrimination: Failure to Accommodate and Unlawful Termination**

32.    During the summer, Defendants continue to operate Staten Island bus routes, although not as many routes as they operate during the regular school year.  Upon information and belief, Mr. Dimino assigns the summer routes in Staten Island according to his personal preference, and not due to a formal company policy.  Further, Ms. Woodard's employment was not covered by a collective bargaining agreement.

33.    On or around June 15, 2017, Mr. Dimino distributed summer bus route assignments to staff.  Ms. Woodard was assigned a summer route in Brooklyn.  Shortly

---

[5] Claudia's last name is unknown to Plaintiff.

thereafter, Ms. Woodard asked Mr. Dimino that she be assigned a summer route in Staten Island.

Mr. Dimino refused her request, claiming that no Staten Island routes were available, and

insisted she drive a route in Brooklyn for the summer.

34.     On or around June 22, 2017, Mr. Dimino gave Ms. Woodard a letter stating, "I

Felicia Woodard have been informed that if I don't work this summer and cover our summer

runs I do not qualify for unemployment because I turned down work.  I will properly be in

jeopardy of losing my job in September due to new hires."  Below were two bullet points which

stated, respectively, "I will work," or "I will not work."  Mr. Dimino requested that Ms.

Woodard sign and return the letter.  She complied, signing her name next to the bullet indicating,

"I will work."

35.     On or around June 27, 2017, Ms. Woodard handed Mr. Dimino a typed

reasonable accommodation request and verbally renewed her plea for a summer route in Staten

Island.  Ms. Woodard's written reasonable accommodation request read as follows:

> I, Felicia Woodard, would like to ask for a Reasonable Accommodation due to the
> disability that you became aware of unintentionally on April 21, 2017.  As
> discussed in your office, I suffer from a disability that will not allow me to
> perform my hired task in "High Volume Traffic Areas."  When hired, I was told I
> would only have a Staten Island route.  This is the only reason I accepted the
> position.  If you . . . have any other position available driving in Staten Island, I'd
> be more than happy to accept.  If you are not willing or [able] to accommodate
> my needs, I will have to decline this Summer Position offered on June 22, 2017.  I
> am also aware of the "agreement" that was signed regarding ineligibility of
> Unemployment Insurance.  However, I will be willing and available to begin
> employment in September 2017, when the fall school semester resumes.  I
> apologize for any inconvenience this may cause your company at this time.[6]

36.     Mr. Dimino responded to Ms. Woodard's request by claiming that Staten Island

summer routes were assigned to employees with more seniority than her.  Upon information and

belief, Staten Island summer routes were not assigned according to seniority, however.

---

[6] Includes minor punctuation edits.

37.     Ms. Woodard's last day of work for Defendants was on or around June 28, 2017, the final day of the 2016−2017 school year.

38.     Defendants never offered Ms. Woodard a position after the regular school year ended.

39.     On or around June 30, 2017, Jackie gave Ms. Woodard a letter from Mr. Dimino that stated, "Felicia Woodard will not be employed this summer due to refusing work in Brooklyn therefore it does not make her eligible for unemployment."

40.     On or around July 6, 2017, Ms. Woodard notified Jackie that she had recently undergone surgery and requested that Barbara Gonzalez, a Vinny's bus matron, be permitted to pick up her paycheck.  Upon information and belief, when Ms. Gonzalez asked Mr. Dimino for Ms. Woodard's check, he said, "Felicia is not getting her fucking check!  All year long, she hated you and now she wants you to get her check, tell her to come get it herself!" or words to that effect.  Mr. Dimino's statement was not only malicious, but also untrue: Ms. Woodard had never harbored ill feelings toward Ms. Gonzalez, let alone expressed such a sentiment.

41.     Following months of accumulated mistreatment, including the hostile work environment and denial of her accommodation request, Mr. Dimino's parting display of animosity conclusively demonstrated that Ms. Woodard was not welcome back.  Thus, Ms. Woodard did not contact Defendants about being rehired.

**Wage and Other Labor Law Violations**

**Hiring Notice Violations**

42.     Defendants did not provide Ms. Woodard a written notification of her pay rate and other policies at her time of hire or any time thereafter.

**Unpaid Wages**

43.     Beginning on or around November 14, 2016, and continuing until approximately June 6, 2017, Defendants required Ms. Woodard to drive groups of autistic schoolchildren and their teachers on field trips approximately twice per week.  These field trip shifts occurred during the break between Ms. Woodard's morning and afternoon shifts, and typically lasted between three and three and one-half hours.  Ms. Woodard was required to work field trip shifts every week during this period except for the weeks of winter, midwinter, and spring recess.  Ms. Woodard was assigned field trip shifts by Mr. Dimino.

44.     A typical field trip shift began when Ms. Woodard completed her morning shift at 8:30 a.m.  Ms. Woodard would drive her bus to the field trip school, arriving around 9:00 a.m., where she would usually pick up three or four students and two teachers and drive them to a local CVS drugstore.

45.     At the store, the teachers supervised the students as they engaged in a variety of tasks, including sorting store items and stocking shelves.  While her passengers were inside the store, Ms. Woodard was required to remain parked nearby in the event of an emergency or other issue involving the students.

46.     When the students were finished in the store, one of the teachers would call or send Ms. Woodard a text message requesting pickup.  The students were normally finished between 11:15 a.m. and 12:00 p.m.  Ms. Woodard would drive her passengers back to the school, usually dropping them off around 12:00 p.m., at which point her lunch break would begin.

47.     Defendants did not pay Ms. Woodard for field trip shifts.

**Wage Statement Violations**

48.     The pay stubs provided by Defendants to Ms. Woodard did not include the hours she worked driving students on the field trips and thus did not accurately report the hours she worked during the applicable pay periods.

## FIRST COUNT

**Disability Discrimination in Violation of the Americans with Disabilities Act:**
**Hostile Work Environment and Disparate Treatment**
**42 U.S.C. § 12101 et seq.**

**Against Vinny's Bus Service Inc.**

49.     Ms. Woodard incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

50.     Ms. Woodard's mental health conditions as described in this Complaint constitute a "disability" within the meaning of the ADA and were perceived by Defendants to constitute a disability.

51.     Ms. Woodard suffered from a mental impairment that substantially limited one or more major life activities, and Defendants also perceived Ms. Woodard as having such an impairment.  42 U.S.C. § 12102(1)−(3).

52.     The ADA prohibits discrimination based on an employee's actual or perceived disability.  42 U.S.C. §§ 12102(1), 12112(a).

53.     The ADA also requires that information obtained from an employee's medical examination be kept confidential.  42 U.S.C. §§ 12112(d)(3)(B), (4)(C).

54.     Defendants violated the ADA by subjecting Ms. Woodard to a hostile work environment and disparate treatment, including by disclosing her confidential medical

information, harassing her, and disparaging her to other employees, because of her actual or perceived disability.

55.     Ms. Woodard has been, and continues to be, damaged as a result of Defendants' unlawful acts, including past and future physical and emotional distress, and the attorneys' fees and costs of bringing this action.

56.     Defendants maliciously and recklessly discriminated against Ms. Woodard based on her actual or perceived disability, and she is therefore also entitled to punitive damages. 42 U.S.C. §§ 1981a(a)(2), 1981a(b)(1).

## SECOND COUNT

### Disability Discrimination in Violation of the Americans with Disabilities Act: Failure to Accommodate and Unlawful Termination 42 U.S.C. § 12101 et seq.

### Against Vinny's Bus Service Inc.

57.     Ms. Woodard incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

58.     Ms. Woodard's mental health conditions as described in this Complaint constitute a "disability" within the meaning of the ADA and were perceived by Defendants to constitute a disability.

59.     Ms. Woodard suffered from a mental impairment that substantially limited one or more major life activities, and Defendants also perceived Ms. Woodard as having such an impairment. 42 U.S.C. § 12102(1)−(3).

60.     At all relevant times, Ms. Woodard was able to perform the essential functions of the job with a reasonable accommodation, and was therefore a "qualified individual with a disability" within the meaning of the ADA.

61.     The ADA prohibits discrimination based on an employee's actual or perceived disability and defines discrimination as including a failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability."  42 U.S.C. §§ 12112(a), 12112(b)(5)(A).

62.     Defendants violated the ADA by refusing to provide reasonable accommodation to Ms. Woodard and unlawfully terminating her employment because of her actual or perceived disability.

63.     Ms. Woodard has been, and continues to be, damaged as a result of Defendants' unlawful acts, including the loss of past and future wages and benefits, past and future physical and emotional distress, and the attorneys' fees and costs of bringing this action.

64.     Defendants maliciously and recklessly discriminated against Ms. Woodard based on her actual or perceived disability, and she is therefore also entitled to punitive damages.  42 U.S.C. §§ 1981a(a)(2), 1981a(b)(1).

### THIRD COUNT

**Disability Discrimination in Violation of the New York State Human Rights Law:
Hostile Work Environment and Disparate Treatment
N.Y. Exec. L. § 296**

**Against Both Defendants**

65.     Ms. Woodard incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

66.     Ms. Woodard's mental health conditions constitute a disability within the meaning of the NYSHRL, which defines disability as "a physical, mental, or medical impairment" or "a condition regarded by others as such an impairment," N.Y. Exec. L. § 292(21), and were regarded by Defendants to constitute a disability.

67.     The NYSHRL prohibits discrimination based on an employee's actual or perceived disability.  N.Y. Exec. L. §§ 292(21), 296(1)(a).

68.     Defendants violated the NYSHRL by subjecting Ms. Woodard to a hostile work environment and disparate treatment, including by disclosing her confidential medical information, harassing her, and disparaging her to other employees, because of her actual or perceived disability.

69.     Ms. Woodard has been, and continues to be, damaged as a result of Defendants' unlawful acts, including past and future physical and emotional distress.

## FOURTH COUNT

### Disability Discrimination in Violation of the New York State Human Rights Law: Failure to Accommodate and Unlawful Termination
### N.Y. Exec. L. § 296

### Against Both Defendants

70.     Ms. Woodard incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

71.     Ms. Woodard's mental health conditions constitute a disability within the meaning of the NYSHRL, which defines disability as "a physical, mental, or medical impairment" or "a condition regarded by others as such an impairment," N.Y. Exec. L. § 292(21), and were regarded by Defendants to constitute a disability.

72.     The NYSHRL provides that "it shall be unlawful discriminatory practice for an employer . . . to refuse to provide reasonable accommodations to the known disabilities of an employee," and "to discharge from employment such individual."  N.Y. Exec. L. §§ 296(3)(a), 296(1)(a).

73.     Defendants violated the NYSHRL by refusing to provide reasonable accommodation to Ms. Woodard, denying her a summer route in Staten Island and unlawfully terminating her employment, because of her actual or perceived disability.

74.     Ms. Woodard has been, and continues to be, damaged as a result of Defendants' unlawful acts, including past and future lost wages and benefits, and past and future physical and emotional distress.

## FIFTH COUNT

**Disability Discrimination in Violation of the New York City Human Rights Law:
Hostile Work Environment and Disparate Treatment
N.Y. City Admin. Code. § 8-107**

**Against Both Defendants**

75.     Ms. Woodard incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

76.     Ms. Woodard's mental health conditions as described herein constitute a disability within the meaning of the New York City Human Rights Law, which defines disability as "any physical, medical, mental or psychological impairment." N.Y. City Admin. Code § 8-102(16).

77.     The NYCHRL prohibits discrimination based on an employee's actual or perceived disability. N.Y. City Admin. Code § 8-107(1)(a).

78.     Defendants violated the NYCHRL by subjecting Ms. Woodard to a hostile work environment and disparate treatment, including by disclosing her confidential medical information, harassing her, and disparaging her to other employees, because of her actual or perceived disability.

79.     Ms. Woodard has been, and continues to be, damaged as a result of Defendants' unlawful acts, including past and future physical and emotional distress.

80.     Defendants discriminated against Ms. Woodard based on her actual or perceived disability with willful or wanton negligence or recklessness, and Ms. Woodard is therefore also entitled to punitive damages under the NYCHRL.  N.Y. City Admin. Code § 8-502.

## SIXTH COUNT

**Disability Discrimination in Violation of the New York City Human Rights Law:
Failure to Accommodate and Unlawful Termination
N.Y. City Admin. Code. § 8-107**

**Against Both Defendants**

81.     Ms. Woodard incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

82.     Ms. Woodard's mental health conditions as described herein constitute a disability within the meaning of the NYCHRL, which defines disability as "any physical, medical, mental or psychological impairment."  N.Y. City Admin. Code section 8-102(16).

83.     The NYCHRL prohibits discrimination based on an employee's actual or perceived disability and requires employers to "make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job."  N.Y. City Admin. Code §§ 8-107(1)(a), (15)(a).

84.     Defendants violated the NYCHRL by refusing to provide reasonable accommodation to Ms. Woodard, denying her a summer route in Staten Island and unlawfully terminating her employment, because of her known disability.

85.     Ms. Woodard has been, and continues to be, damaged as a result of Defendants' unlawful acts, including the loss of past and future wages and benefits, past and future physical and emotional distress, and the attorneys' fees and costs of bringing this action.

86.     Defendants discriminated against Ms. Woodard based on her actual or perceived disability with willful or wanton negligence or recklessness, and Ms. Woodard is therefore also entitled to punitive damages under the NYCHRL.  N.Y. City Admin. Code § 8-502.

## SEVENTH COUNT

**Minimum Wages Under the Fair Labor Standards Act**
**29 U.S.C. § 206(a)**

**Against Both Defendants**

87.     Ms. Woodard incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

88.     Defendants are employers within the meaning of the FLSA.

89.     Upon information and belief, at all relevant times, Defendants were engaged in commerce within the meaning of the FLSA in that each (a) had employees engaged in commerce or in the production of goods for commerce, or who handled, sold, or otherwise worked on goods or materials that were moved in or produced for commerce by any person; and (b) had an annual gross volume of sales of not less than $500,000.

90.     At all relevant times, Ms. Woodard was an employee engaged in commerce within the meaning of the FLSA.

91.     At all relevant times, the federal minimum wage was $7.25 per hour.

92.     By failing to pay Ms. Woodard any wages for the field trip shifts she worked, Defendants failed to pay the lawful minimum hourly wage for all hours worked in violation of the FLSA, 29 U.S.C. § 206(a).

93.     Defendants willfully failed to pay Ms. Woodard the lawful minimum hourly wage.

94.     Accordingly, pursuant to the FLSA, 29 U.S.C. § 216(b), Ms. Woodard is entitled to recover from Defendants, jointly and severally, her unpaid minimum wages, liquidated damages, and her reasonable attorneys' fees and costs of this action.

## EIGHTH COUNT

### Minimum Wages Under the New York Labor Law
### N.Y. Labor Law § 652

### Against Both Defendants

95.     Ms. Woodard incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

96.     Throughout the period that Ms. Woodard worked for Defendants, she was Defendants' employee and Defendants were her employers within the meaning of the NYLL.

97.     From October 14, 2016 to December 30, 2016, the New York State minimum wage was $9.00 per hour.  From December 31, 2016, to June 28, 2017, the New York State minimum wage for employers located in New York City with 11 employees or more was $11.00 per hour.

98.     By failing to pay Ms. Woodard any wages for the field trip shifts she worked, Defendants failed to pay Ms. Woodard the lawful minimum hourly wage for all hours worked in violation of the NYLL and implementing regulations, including but not limited to NYLL § 652 and Title 12 of the New York Codes, Rules and Regulations, Section 142-2.1.

99.     Accordingly, pursuant to NYLL § 663, Ms. Woodard is entitled to recover from Defendants, jointly and severally, her unpaid wages, liquidated damages, pre-judgment interest, and her reasonable attorneys' fees and costs of the action.

## NINTH COUNT

**Wage Statement Violations under the NYLL**
**N.Y. Labor Law § 195(3)**

**Against Both Defendants**

100.    Ms. Woodard incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

101.    Defendants violated NYLL § 195(3) by not providing Ms. Woodard with accurate

pay stubs with every payment of wages.  Specifically, the pay stubs provided by Defendants

from approximately November 14, 2016, until June 6, 2017, did not accurately report the hours

Ms. Woodard had worked for Defendants during the applicable pay periods.

102.    Pursuant to NYLL § 198(1-d), Ms. Woodard is entitled to recover from

Defendants damages of $250 per work day for the duration of Defendants' violations of NYLL §

195(3), up to $5,000, and her reasonable attorneys' fees and costs of the action.

## TENTH COUNT

**Hiring Notice Violations Under the NYLL**
**N.Y. Labor Law § 195(1)(a)**

**Against Both Defendants**

103.    Ms. incorporates by reference the allegations contained in the previous paragraphs

of the Complaint as if fully rewritten herein.

104.    Effective April 9, 2011, NYLL § 195(1)(a) requires that every employer provide

its employees in writing a notice at the time of hiring with information about the rate of pay and

other employment-related information.

105.    When Defendants hired Ms. Woodard, they violated NYLL § 195(1)(a) by not

providing her with a written notice advising her of her pay rates and other details.

106.     Pursuant to NYLL § 198(1-b), Ms. Woodard is entitled to recover from Defendants damages of $50 per work day for the duration of Defendants' violations of NYLL §195(1)(a), up to $5,000, and her reasonable attorneys' fees and costs of the action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1.   Declare that the acts complained of herein constitute violations of the Americans with Disabilities Act, New York State Human Rights Law, New York City Human Rights Law, Fair Labor Standards Act, New York Labor Law, and respective regulations thereunder;

2.   Order the Defendant to compensate Plaintiff for her damages, including her lost wages and benefits, future lost wages and benefits, and her past and future physical and emotional distress;

3.   Enter judgment in favor of Plaintiff for such amount as may be awarded for punitive damages, including under the ADA and NYCHRL;

4.   Award to Plaintiff unpaid wages due under the FLSA and NYLL;

5.   Award to Plaintiff damages for violations of the notice requirements of the NYLL;

6.   Award to Plaintiff damages for violations of the wage statement requirements of the NYLL;

7.   Award to Plaintiff liquidated damages pursuant to the FLSA and NYLL;

8.   Award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action;

9.   Award to Plaintiff pre-judgment interest; and

10. Grant such additional or alternative relief as may appear to this Court to be just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: New York, New York
February 26, 2018

By: _/s/_ Joshua Carrin_____
**THE LEGAL AID SOCIETY**
Seymour W. James, Attorney-in-Chief
Adriene Holder, Attorney-in-Charge, Civil Practice
Karen Cacace, Director, Employment Law Unit
Joshua Carrin, Of Counsel
199 Water Street, 3rd Floor
New York, New York 10038
jcarrin@legal-aid.org
Telephone: (212) 577-3534

*Attorneys for Plaintiff*
*Felicia Woodard*